# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Dawn D. Ready,**

     **Plaintiff,**

**v.**               **Case No. 15-cv-9235-JWL**

**Southeast Kansas Mental Health Center,**

     **Defendant.**


## <u>MEMORANDUM & ORDER</u>

  Plaintiff Dawn D. Ready filed this lawsuit against defendant, her former employer, asserting that defendant terminated plaintiff's employment on the basis of her gender and/or her age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.  Plaintiff also asserts several claims under the Americans with Disabilities Act, 42 U.S.C. § 12101—that defendant terminated plaintiff on the basis of her disability and/or in retaliation for engaging in protected activity and that defendant failed to accommodate her disability.  Finally, plaintiff claims that defendant terminated her employment in violation of Kansas public policy.  This matter is presently before the court on defendant's motion for summary judgment on all claims (doc. 43).  As explained below, the motion is granted in part and denied in part.


## I.  Facts

  The following facts are uncontroverted, stipulated in the pretrial order, or related in the light most favorable to plaintiff as the nonmoving party.  Defendant Southeast Kansas Mental

Health Center (SEKMHC) is a private non-profit community mental health center with offices in several cities in southeast Kansas.  Plaintiff Dawn Ready was employed by the organization from 1999 until the termination of her employment in 2013.  At all times relevant to this lawsuit, Bob Chase was the executive director of SEKMHC and Dr. John Helton was the director of clinical services for SEKMHC.

Plaintiff was hired as a crisis intervention therapist in 1999.  In December 2003, plaintiff was reassigned to the position of outpatient therapist and she began working primarily out of defendant's Chanute, Kansas office.  At that time, Dr. Helton became her immediate supervisor.  During this same time frame, plaintiff was diagnosed with primary biliary cirrhosis, an autoimmune disease.  At some point, she was also diagnosed with Hashimoto's thyroiditis and intermittent asthma.  It is undisputed that Mr. Chase and Dr. Helton were aware of plaintiff's diagnoses and defendant concedes for purposes of its motion that one or more of plaintiff's diagnoses constitutes a "disability" for purposes of the ADA.  These early years of plaintiff's employment were not without incident.  Plaintiff, for example, was counseled for performance issues and her coworkers sometimes complained about her demeanor.  Moreover, Dr. Helton recommended plaintiff's termination in 2004.  Mr. Chase declined to adopt that recommendation and her employment continued.  But the vast majority of any performance-related or personality-related issues regarding plaintiff's employment during these years are not pertinent to the disposition of defendant's motion.

In 2009, Dr. Shawna Wright became the operations manager for the Chanute office.  One of her first initiatives was to improve therapists' productivity by instituting a "goal" of 1200 billable hours per year.  In 2009, 2011 and 2012, plaintiff billed below the 1200-hour goal and

2

billed the lowest number of hours of any full-time outpatient therapist.  At the time of her termination in November 2013, plaintiff had billed the lowest number of hours of any full-time outpatient therapist for that calendar year.

In 2010 or 2011, plaintiff began requesting various accommodations for her disability, primarily related to various odors or chemicals in the air that would aggravate her asthma and her primary biliary cirrhosis.  On several occasions, she asked Dr. Wright and Dr. Helton to remove all aerosol sprays from the office, including automatic air fresheners in the staff and lobby restrooms and the lobby itself.  While the automatic air fresheners were ultimately removed from the staff restrooms permanently, defendant never removed the air fresheners from the lobby or the lobby restrooms.  In addition, plaintiff asked defendant's management to remind the staff to avoid using aerosol sprays, perfumes or scented lotions; to change the window cleaner to a non-ammonia based product; to rearrange pest control treatments to accommodate plaintiff's schedule; and to "air out" new office chairs prior to bringing those chairs into the office.  She sought confirmation from management that the no-smoking policy would be enforced and reviewed with staff.  She requested that defendant use non-VOC paint when the offices were repainted.  She asked to have the duct work and vents cleaned throughout the building.  She asked that staff members refrain from burning candles.  When the parking lot was repaved, she asked permission to leave for the day because the odor was too strong.  Plaintiff had to repeat several of these requests before defendant responded to her but it is undisputed that, except for the automatic air fresheners in the lobby and lobby restrooms, defendant complied (admittedly, sometimes with frustration) with each of plaintiff's requests for

accommodations and routinely reminded employees to comply with these requests. The record reflects that plaintiff routinely made these types of requests until the end of her employment.

In March 2012, both Dr. Helton and Dr. Wright recommended the termination of plaintiff's termination. According to defendant, that recommendation was based on plaintiff's treatment of staff members, her low productivity and the fact that several clients refused to see plaintiff for counseling services. Mr. Chase declined to adopt that recommendation. Defendant asserts that these concerns continued throughout 2012 and into 2013. Dr. Helton sent a memorandum to Mr. Chase in early January 2013 outlining these concerns again. In early February 2013, Dr. Helton and Dr. Wright met with plaintiff to discuss these concerns.

On October 31, 2013, plaintiff called Mr. Chase to notify him that she and a number of coworkers had been experiencing symptoms that she attributed to mold in the building. In response, Mr. Chase angrily yelled, "I don't have to accommodate you!" Mr. Chase inspected the building and found no evidence of mold, although he concedes he likely would not have been able to identify the presence of mold. Mr. Chase believed that plaintiff's symptoms had been triggered by the recent replacement of the furnace air filters in the office. On November 1, 2013, plaintiff sent Mr. Chase a follow-up email in which she indicated her hope that defendant would attempt to discover the source of the problem. Mr. Chase responded that defendant was "already looking into it." Following plaintiff's email, Mr. Chase arranged for a general contractor to perform a walk-through of the building and no mold was discovered. Eventually, plaintiff's symptoms subsided.

At lunchtime on November 15, 2013, Melinda Huston (a front desk employee) approached plaintiff and disclosed that she was concerned that one of defendant's child case

managers was self-mutilating, had an eating disorder and was suicidal.  Ms. Huston told plaintiff that she had reached out to Malinda Bailey, defendant's Director of Children's Services. Plaintiff told Ms. Huston that if they did not "hear anything" by Monday, then plaintiff would contact Dr. Helton.    After having a telephone discussion with Ms. Huston, Ms. Bailey immediately called defendant's associate executive director Nathan Fawson to discuss a plan of action and to arrange a meeting for Monday, November 18, 2013.  Mr. Chase was also advised of the situation on Friday, November 15, 2013 and he contacted Dr. Helton that evening to advise him about the situation and about the meeting scheduled for Monday.   There is no evidence that the case manager saw clients on Friday, November 13, 2013 or over the weekend. In any event, on Friday, November 15, 2013, plaintiff told several coworkers about the case manager situation, including her plan to contact Dr. Helton on Monday morning.

On Monday morning, November 18, 2013, plaintiff sent an email to Dr. Helton that read as follows:

> Late last week Melinda made me aware that [case manager] has been self-mutilating, along with a host of other behaviors.  I advised Melinda to contact [case manager's] supervisor ASAP.  Since Melinda revealed this to me, I have been concerned about my client's [sic] who are assigned to her, some who may be cutters as well.  My concern with protecting the client has been weighing on me and really I do not feel comfortable with my current/future client's [sic] seeing her.  Given that Melinda shared this with me, I decided it would be best to pass along to you in addition to Melinda sharing with Malinda Bailey.

Dr. Helton testified that he was concerned that plaintiff had not disclosed the information immediately upon learning it.  Defendant's evidence suggests that Dr. Helton and Mr. Chase were also concerned that plaintiff had discussed the matter with her coworkers without advising management of the situation first and letting management handle the situation.  On November

25, or 26, 2013, Mr. Chase asked Dr. Helton whether he recommended the termination of plaintiff's employment and Dr. Helton responded that he did.  Dr. Wright agreed with that recommendation.  Plaintiff's employment was terminated on November 26, 2013.  She was 49 years old at that time.

Nearly three months after the termination of plaintiff's employment, Dr. Helton created a document entitled "History of Performance Concerns:  Dawn Ready, LCP."  The document contains 77 separate "events" concerning plaintiff's employment with corresponding dates ranging from 1999 through 2013 and is nearly 8 pages in length.  The events range from plaintiff "cherry picking" her caseload and getting behind on paperwork to her treatment of her coworkers and her requests for accommodations.  Dr. Helton testified that each of the items in the document were performance or disciplinary concerns that he had with respect to plaintiff. However, when asked about specific entries concerning plaintiff's requests for accommodations, he testified that those "events" were not performance concerns.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II.     Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  *Water Pik, Inc. v. Med–Systems, Inc*., 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a).  A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Water Pik, Inc.*, 726 F.3d at 1143 (quotation omitted).  "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id*. at 1143-44.

### III.    Gender and Age Discrimination

In the pretrial order, plaintiff contends that defendant terminated her employment on the basis of her gender and/or age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. As plaintiff has no direct evidence of discrimination, her claims are analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012).  Under *McDonnell Douglas*, plaintiff has the initial burden of establishing a prima facie case of discrimination.  *Id*. To set forth a prima facie case of discrimination, plaintiff must establish "(1) membership in a protected class and (2) an adverse employment action (3) that took place under circumstances giving rise to an inference of discrimination." *Id*. (citing *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007)).  If she establishes a prima facie case, the burden shifts to defendant to assert a legitimate, nondiscriminatory reason for the adverse employment action.  *Id*.  If defendant meets this burden, summary judgment against plaintiff is warranted unless she introduces evidence "that the stated nondiscriminatory reason is merely a pretext for

discriminatory intent." *Id.* (citing *Simmons v. Sykes Enters.*, 647 F.3d 943, 947 (10th Cir. 2011)).

A.    *Plaintiff's Prima Facie Case*

In its motion for summary judgment, defendant contends that plaintiff cannot establish a prima facie case of gender and age discrimination because she cannot show that the termination of her employment took place under circumstances giving rise to an inference of discrimination. To raise an inference of discrimination at the prima facie stage in a discriminatory discharge case, a plaintiff's burden is not onerous—she need only show that she belongs to a protected class; that she was qualified for her job; and that the job was not eliminated after her discharge. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1229 (10th Cir. 2000); *Perry v. Woodward*, 199 F.3d 1126, 1138 (10th Cir. 1999); *see also Nguyen v. Gambro BCT, Inc.*, 242 Fed. Appx. 483, 487-89 (10th Cir. 2007) (prima facie step is utilized to eliminate the two most common explanations for termination—lack of qualification or the elimination of the position). Defendant contends that plaintiff's job was essentially eliminated after her discharge because her caseload was simply absorbed by existing employees.  In response, plaintiff directs the court to evidence that defendant hired a new outpatient therapist who was significantly younger than plaintiff roughly 7 months after plaintiff's termination.   Plaintiff also relies on her pretext evidence to support her prima facie case.  While the court questions whether plaintiff's evidence is sufficient to survive the prima facie stage, the court believes it is appropriate in these circumstances to resolve plaintiff's claims at the pretext stage.   This aspect of defendant's motion is denied.  *See Adamson v. Multi Community Diversified Servs., Inc.*, 514 F.3d 1136,

1151 (10th Cir. 2008) ("[T]here is no proscription in an appropriate case against using pretext evidence to support a prima facie case if it indeed gives rise to an inference of actionable discriminatory intent.").

B.    The Pretext Analysis

Because the court assumes that plaintiff has satisfied her burden of establishing a prima facie case of discrimination, the court turns to whether defendant has met its burden to articulate a legitimate, nondiscriminatory reason for plaintiff's discharge.   "This burden is one of production, not persuasion; it can involve no credibility assessment."  *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).   The Tenth Circuit has characterized this burden as "exceedingly light," and the court finds that defendant has carried it here.  *See id*. According to defendant, plaintiff was terminated based on historic underperformance, poor interactions with coworkers, failing to improve with training and counseling, and failing to immediately disclose her knowledge of a case manager's self-harming behavior.  The burden of proof, then, shifts back to plaintiff to show that defendant's proffered reasons are pretextual.

Evidence of pretext "may take a variety of forms," including evidence tending to show "that the defendant's stated reason for the adverse employment action was false" and evidence tending to show "that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances."  *Id*. at 1150 (quoting *Kendrick*, 220 F.3d at 1230).   A plaintiff may also show pretext with evidence that the defendant had "shifted rationales" or that it had treated similarly situated employees differently.  *Crowe v. ADT*

9

*Servs., Inc.*, 649 F.3d 1189, 1197 (10th Cir. 2011). In essence, a plaintiff shows pretext by presenting evidence of "weakness, implausibility, inconsistency, incoherency, or contradiction in the employer's stated reasons, such that a reasonable jury could find them unconvincing." *Debord v. Mercy Health System of Kansas, Inc.*, 737 F.3d 642, 655 (10th Cir. 2013). In determining whether the proffered reason is pretextual, the court examines "the facts as they appear *to the person making the decision*, not as they appear to the plaintiff." *Id.* (emphasis in original). The court does not "ask whether the employer's proffered reasons were wise, fair or correct" but only whether "the employer honestly believed those reasons and acted in good faith upon those beliefs." *Id.* The court analyzes plaintiff's pretext evidence below.

1.      Subjective Nature of Defendant's Proffered Reasons

Plaintiff first attempts to establish pretext by highlighting that defendant's proffered reasons are "subjective" in nature and that this subjectivity is sufficient to establish pretext because the reasons are tied only to the perceptions of plaintiff's supervisors and not to objective criteria. This argument is rejected. While the use of subjective criteria in connection with a termination decision may be relevant evidence of pretext in certain circumstances, those circumstances are not present here. *See Matthews v. Euronet Worldwide, Inc.*, 271 Fed. Appx. 770, 775 (10th Cir. Mar. 28, 2008). Even assuming that some of defendant's articulated reasons are subjective in nature,[1] those reasons are supported by objective facts. With respect to plaintiff's productivity, the evidence demonstrates that defendant measured productivity through

---

[1] Plaintiff's failure to immediately disclose her knowledge of the case manager's behavior is not a subjective reason and plaintiff does not suggest otherwise.

a billable hour requirement that it tracked for full-time outpatient therapists.  To the extent defendant contends that plaintiff's productivity was low, that proffered reason is supported by objective evidence reflecting plaintiff's annual billable hours from 2009 through 2013.  With respect to plaintiff's interactions with coworkers and others, defendant has offered specific examples of those interactions, including evidence of specific complaints from front desk staff and evidence that one of defendant's key clients refused to have their clients scheduled with plaintiff.  Thus, unlike subjective criteria used in some hiring and promotion decisions, *see Bauer v. Bailar*, 647 F.2d 1037, 1046 (10th Cir. 1981), the defendant has proffered termination justifications with reasonable specificity, and it has sufficiently articulated bases for plaintiff's termination. *See id.*

2.      Similarly Situated Employees

Plaintiff contends that defendant's proffered reasons are unworthy of belief because defendant treated similarly-situated, non-protected outpatient therapists more favorably than it treated plaintiff.  *See Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 540 (10th Cir. 2014) ("A plaintiff may . . . show pretext . . . by providing evidence that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness.").  Specifically, plaintiff identifies Kevin Zvilna, Jeffrey Phillips and William Carr as outpatient therapists who were treated more favorably than plaintiff.  This argument fails. Plaintiff admits that Mssrs. Zvilna, Phillips and Carr were all terminated for productivity concerns among other concerns.  Her complaint is that defendant permitted these individuals to "voluntarily" resign their employment in lieu of termination—an option that was not offered to

11

plaintiff. This distinction, however, does not in any way demonstrate that defendant's reasons for terminating plaintiff's performance are pretextual and no reasonable jury could find otherwise, particularly where it is undisputed that, had these individuals not resigned, they would have been terminated. *Ehiremen v. Glanz,* 2016 WL 1091105, at *5 (N.D. Okla. Mar. 21, 2016) (Ehiremen provides no authority that pretext may be inferred from evidence that an employer terminated a minority employee but allowed a similarly culpable, nonminority employee to resign. Courts generally have not considered a terminated employee to have been treated differently from one forced to resign when the employee did not attempt to resign and the employer's policies did not require it to offer the employee the chance to resign."); *Monroe v. City of Lawrence*, 124 F. Supp. 3d 1097, 1122 (D. Kan. 2015) (pretext may not be inferred from evidence that an employer terminated a minority employee but merely forced a similarly culpable, nonminority employee to resign in lieu of termination). In the absence of any evidence that plaintiff sought to resign but was denied that opportunity or that a policy required defendant to offer her the option of resigning, the forced resignation of these individuals does not establish pretext. *See Bahl v. Royal Indemnity Co.*, 115 F.3d 1283, 1293 (7th Cir. 1997) (comparatively minimal difference in treatment between plaintiff, who was terminated, and other employee, who was offered option of resignation or termination, was inadequate to support inference of discrimination).[2]

---

[2] There is evidence that one of these employees was permitted to stay on for several months before resigning as opposed to being forced to resign immediately. Nonetheless, no jury could infer pretext because plaintiff has not established that plaintiff and the employees she identifies are "similarly situated." Specifically, plaintiff has come forward with no evidence that the problems these employees had were as prolonged or as serious as plaintiff's problems, especially in light of the fact that none of these employees had knowledge of the case manager's

3.      Case Manager Situation

In her submissions, plaintiff devotes a significant number of pages to explaining why she handled the case manager situation the way in which she did and why she believes she handled that matter reasonably under the circumstances.   She urges that she did not report the information until Monday morning because, in her mind, another manager was already notified of the situation.   Plaintiff's argument, however, does not remotely show that defendant terminated plaintiff's employment based on her gender or age or that this particular reason for plaintiff's termination was not credible.   As aptly summarized by the Tenth Circuit:

> Under *McDonnell Douglas*, [the court's] role isn't to ask whether the employer's decision was wise, fair or correct, but whether it honestly believed the legitimate, nondiscriminatory reasons it gave for its conduct and acted in good faith on those beliefs.
>
> That individuals and companies sometimes make employment decisions that prove to be bad ones in hindsight usually suggests no more than that—that they got it wrong.   To support an inference of pretext, to suggest that something more nefarious might be at play, a plaintiff must produce evidence that the employer did more than get it wrong.   He or she must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda.   This is because Title VII licenses [the court] not to act as a "super personnel department" to undo bad employment decisions; instead it charges [the court] to serve as a vital means for redressing discriminatory ones.

*Johnson v. Weld County, Colorado*, 594 F.3d 1202, 1211 (10th Cir. 2010) (citations omitted).

At most, plaintiff here has demonstrated that defendant may have treated her unfairly when it

---

self-harming behavior and failed to immediately report that knowledge.   *Roberts v. Int'l Bus. Machs.*, 733 F.3d 1306, 1310 (10th Cir. 2013) (noting that evidence that a similarly situated employee received better treatment can suggest pretext, but that the other employee must, in fact, be similarly situated—"that is, reporting to the same supervisor, held to the same standards, and afoul of those standards to at least the same degree").

terminated her employment.  She is not entitled to a jury trial on her gender and age claims based on such a showing.

Plaintiff also suggests that her failure to immediately disclose her knowledge of the case manager's self-harming behavior cannot be the true reason for her discharge because defendant did not immediately act upon the information when they received it in any event.  According to plaintiff, then, any delay in plaintiff's report was not important to defendant.  The record does not support the suggestion that defendant did not act immediately on the information.  It is undisputed that Ms. Bailey, after ending the phone call with Ms. Huston, called defendant's Associate Executive Director to discuss an immediate plan of action and then scheduled a meeting for Monday, November 18, 2013.  It is further uncontroverted that the case manager did not see any clients on Friday, November 15, 2013 and would not have seen any clients over the weekend in any event.  Moreover, Mr. Chase telephoned Dr. Helton on Friday evening, November 15, 2013 to inform him about the situation and the plan to meet on Monday.  Clearly, then, defendant acted on the information as soon as it obtained the information.

Similarly, plaintiff's complaint that defendant did not terminate other employees who were aware of the case manager situation and failed to report it to management fails to establish pretext.  It is undisputed that each of these employees first learned about the case manager situation from plaintiff, who also advised these employees that she intended to report the situation on Monday morning.  In such circumstances, the Circuit affords substantial latitude to employers in making discipline-related decisions and defendant was well within its right to determine that plaintiff's conduct was the most severe and culpable.  *See Salguero v. City of Clovis*, 366 F.3d 1168, 1177 (10th Cir. 2004).

Finally, plaintiff suggests that pretext is established because defendant, during its investigation into the incident, never asked plaintiff for her "side of the story." Plaintiff does not suggest that defendant violated any internal policy when it failed to interview her prior to terminating her employment. Rather, plaintiff contends only that the Tenth Circuit has suggested that a failure to obtain an employee's version of events prior to termination may support an inference of pretext. But the single case relied upon by plaintiff—and every other Circuit case that supports that statement—arose in the context of assessing the "cat's paw" theory of recovery wherein a plaintiff seeks to establish pretext by presenting evidence that a biased subordinate who lacked decision-making authority used the formal decision-maker as a dupe in a deliberate scheme to bring about an adverse employment action. *See, e.g., Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 515-17 (10th Cir. 2015) (citing cases); *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 542-43 (10th Cir. 2014). In those cases, the Circuit has recognized that an employer can establish that the employer was not tainted by the biased subordinate if it conducted an independent investigation of the subordinate's decision. *See Thomas*, 803 F.3d at 516-17. And one way in which an employer might accomplish that independent investigation is by giving the employee an opportunity to share his or her side of the story. *Id.* at 517 (an employer's request that the employee give her side of the story is sufficient to defeat any inference that the decision was based on a subordinate's bias). The Circuit has never held or suggested outside that specific context (a context that is not implicated in this case as there are no allegedly biased subordinates on which the decisionmakers relied) that an employer's failure to interview an employee, standing alone, is sufficient to establish pretext. This argument, then, is rejected.

4.      Historic Underperformance

Plaintiff attempts to cast doubt on defendant's articulated "productivity" concerns by arguing that defendant's billable hours requirement was "skewed in favor of non-disabled employees" because the requirement did not account for medical leave taken by disabled employees, including plaintiff.  Plaintiff urges that the hours requirement was unfairly applied to disabled employees and that her billable hours requirement should have been adjusted to reflect her medical condition.   This argument, however, fails to show that defendant terminated plaintiff's employment based on her gender or age.  Stated another way, even assuming that the hours requirement adversely affected disabled employees, that fact does not suggest that defendant's    proffered    reason    for    terminating    plaintiff's    employment—historic underperformance—was unworthy of belief or was simply an excuse to hide gender or age discrimination.    In the absence of any suggestion that defendant applied the billable hours requirement disparately based on age or gender or any evidence that defendant, in fact, was not concerned about plaintiff's productivity, this argument fails to establish pretext.

5.      Poor Interaction/Failure to Improve

Plaintiff contends that these proffered reasons are unworthy of belief because defendant failed to provide specific examples of plaintiff interacting poorly with her coworkers and plaintiff did not actually receive any counseling or training.   The record does not support plaintiff's argument.   The record contains numerous specific examples in which plaintiff's coworkers complained about negative interactions with plaintiff—including repeated complaints

16

about plaintiff's treatment of the front desk staff—and, more importantly, plaintiff admitted in her deposition that she was aware that defendant had received complaints from the front desk staff about her treatment of them.  While plaintiff contends that those complaints were "not legitimate" or were based on plaintiff's disability, she has come forward with no evidence suggesting that defendant did not honestly believe that plaintiff's coworkers were concerned about plaintiff's treatment of them or that defendant did not honestly believe that plaintiff interacted poorly with her coworkers.  *Sanders v. Southwestern Bell Telephone, L.P.*, 544 F.3d 1101, 1107 (10th Cir. 2008) (it is the manager's perception of the employee's performance that is relevant, not the plaintiff's subjective evaluation of his own relative performance).  Similarly, the record demonstrates—and plaintiff concedes—that her supervisors met with her on several occasions to discuss productivity concerns as well as her negative interactions with her coworkers.  While plaintiff may not have perceived these discussions as "training" or "counseling" sessions, she admits that they occurred.  Plaintiff, then, has not established pretext.

6.    Dr. Helton's Memorandum

Finally, plaintiff attempts to establish pretext with respect to her gender discrimination claim by highlighting a notation made by Dr. Helton in his memorandum relating to plaintiff's "history of performance concerns."  Item 72 of that memorandum states as follows:

> Documentation was often overdue, resulting in billing being held up sometimes to the point it could not be billed.  If others had problems it was corrected and seldom occurred again with some exceptions.  A female counselor and a female therapist were terminated for repeated failure to keep documentation current. There is also a male counselor who has not been terminated yet.

17

Plaintiff asserts that this entry in the memorandum is sufficient to permit a jury to conclude that defendant had a "pattern and practice" of engaging in gender discrimination by treating male and female employees differently for "the same violations." The court disagrees. The document provides no context from which the jury could infer that the male employee was similarly situated to plaintiff or to the other female employees referenced by Dr. Helton to permit an inference of discrimination. It is unclear from the document whether the male employee was ultimately terminated, what that employee's particular shortcomings might have been, and whether any alternative explanations might exist for the alleged differential treatment. Without more information, no reasonable jury could draw the inference suggested by plaintiff. *Roberts v. Int'l Bus. Machs.*, 733 F.3d 1306, 1310 (10th Cir. 2013) (noting that evidence that a similarly situated employee received better treatment can suggest pretext, but that the other employee must, in fact, be similarly situated—"that is, reporting to the same supervisor, held to the same standards, and afoul of those standards to at least the same degree").

7.     Totality of Plaintiff's Pretext Evidence

While the court has addressed (and rejected) separately the pieces of circumstantial evidence that plaintiff claims demonstrate a pretextual explanation for her termination, the court's inquiry is not at an end. The ultimate question on summary judgment for purposes of this case is whether plaintiff has presented sufficient evidence such that there is a genuine issue of material fact concerning whether plaintiff's gender or age actually motivated defendant's decision to terminate her employment. This question "cannot be answered by looking at the plaintiff's evidence in a piecemeal manner." *Voltz v. Coca–Cola Enterprises Inc.*, 2004 WL

18

100507, at *9 (10th Cir. 2004).  Rather, the court must consider whether plaintiff's evidence, taken as a whole, is sufficient to show pretext.  *Sanders v. Southwestern Bell Telephone, L.P.,* 544 F.3d 1101, 111 (10th Cir. 2008) F.3d 1321, 1331 (10th Cir. 1999) (noting that the court, in pretext analysis, is required to consider circumstantial evidence in its totality).  Ultimately, the court concludes that the facts of this case, even viewed in the aggregate and in the light most favorable to plaintiff, do not give rise to an inference of pretext.  For even considering the totality of plaintiff's evidence, that evidence does not demonstrate that defendant's asserted reason for plaintiff's termination is "so weak, implausible, inconsistent, incoherent, or contradictory as to support a reasonable inference that [defendant] did not act for those reasons." *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1179 (10th Cir.2006).  Stated another way, plaintiff's evidence is insufficient for a reasonable jury to find that defendant's proffered justifications were not the real reasons for plaintiff's termination.  Plaintiff, then, has failed to meet her burden of demonstrating pretext and summary judgment in favor of defendant is warranted on plaintiff's gender and age discrimination claims.

## IV.    Disability Claims

In the pretrial order, plaintiff asserts claims for disability discrimination and retaliation under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, as amended by the ADA Amendments Act of 2008 (ADAAA), Pub. L. No. 110-325, 122 Stat. 3553.  According to plaintiff, defendant terminated her employment on the basis of her disability and/or in retaliation for plaintiff's repeated requests for accommodations.  Plaintiff also asserts that defendant failed

to accommodate plaintiff's disability.    Defendant moves for summary judgment on each of these claims.

A.  *Termination Claims*

The ADAAA prohibits employers from discriminating against "a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  The statute's retaliation provision provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  Plaintiff contends that defendant violated both provisions when it terminated her employment.

To establish a prima facie case of employment discrimination under the ADA, plaintiff must present evidence that (1) she is disabled within the meaning of the ADA; (2) she is qualified to perform the essential functions of her job with or without accommodations; and (3) she was terminated under circumstances which give rise to an inference that the termination was based on his disability.  *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 544 (10th Cir. 2014) (citations omitted).  To establish a prima facie case of ADA retaliation, plaintiff must prove that (1) she "engaged in a protected activity"; (2) she was terminated subsequent to or contemporaneous with that protected activity; and (3) there was "a causal connection" between the protected activity and the termination of plaintiff's employment.

If plaintiff is able to make such a showing with respect to her discrimination or retaliation claims, the burden shifts to defendant to articulate some legitimate, nondiscriminatory or non-

retaliatory reason for the termination decision. *Carter v. Pathfinder Energy Services, Inc.*, 662 F.3d 1134, 1141 (10th Cir. 2011) (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973)). Plaintiff then bears the ultimate burden of showing that defendant's proffered reason is in fact a pretext designed to mask discrimination or retaliation. *See id.* (citing *McDonnell Douglas*, 411 U.S. at 804).[3]

1. Prima Facie Case

In its motion, defendant asserts that plaintiff cannot establish a prima facie case of discrimination or retaliation because there are no circumstances giving rise to an inference of discrimination.[4] While defendant concedes that plaintiff was terminated within one month of asking Mr. Chase to investigate the office for mold, defendant urges that plaintiff's failure to immediately disclose her knowledge of the case manager's self-harming behavior is an intervening event that negates an inference of discrimination that might arise from the timing of plaintiff's termination. This is a question for the jury to resolve. While a jury might ultimately conclude that the case manager situation was the motivating factor in the decision to terminate plaintiff, a jury could also reasonably conclude that the case manager situation was an excuse to terminate plaintiff after defendant grew weary of plaintiff's disability and her repeated requests for accommodations. Significantly, defendant does not controvert for purposes of its motion

---

[3] Plaintiff contends that she has come forward with direct evidence of disability discrimination such that the court need not analyze these claims under the McDonnell Douglas framework. Because the court finds that these claims survive summary judgment in any event, the court does not consider whether plaintiff has direct evidence of discrimination.

[4] Defendant concedes for purposes of its motion that plaintiff is a "qualified individual with a disability" for purposes of her discrimination claim and that plaintiff, by requesting accommodations, engaged in protected activity for purposes of her retaliation claim.

that Mr. Chase reacted angrily when plaintiff approached him about the possibility of mold in the office on October 31, 2013 and that he responded to her by yelling "I do not have to accommodate you!" It is undisputed, at this juncture, that Mr. Chase had reacted in a similar fashion on several occasions to prior requests made by plaintiff. Moreover, defendant fails to explain the 10-day delay between the case manager situation and the decision to terminate plaintiff's employment—suggesting that the case manager situation was not nearly as concerning to defendant as it now contends. In light of this evidence, the court rejects defendant's argument that the case manager situation is an intervening event that, as a matter of law, negates an inference of pretext.[5] And the fact that plaintiff's employment was terminated less than one month after she raised concerns about the presence of mold in the office, coupled with Mr. Chase's response to those concerns, is sufficient to establish the requisite causal connection with respect to her retaliation claim as well as her discrimination claim. *See EEOC v. PVNF, LLC*, 487 F.3d 790, 804 (10th Cir. 2007) (where termination occurred within one month of protected activity, inference of causation permissible); *see also Tadlock v. Marshall County HMA, LLC*, 603 Fed. Appx. 693, 702-03 (10th Cir. Feb. 25, 2015) (temporal proximity between separation and discussions about disability and need for accommodations can satisfy third element of ADA discrimination claim).

---

[5] In support of its argument, defendant directs the court to *Aman v. Dillon Companies, Inc.*, 645 Fed. Appx. 719 (10th Cir. Apr. 15, 2016). But the district court in that case expressly held that the plaintiff had established a prima facie case of retaliation at the summary judgment stage despite the defendant's evidence regarding "intervening acts." *Id.* at 727. That claim proceeded to trial after which the court granted judgment as a matter of law to the defendant because the plaintiff had offered no evidence of retaliation other than temporal proximity. *See id.* This case, then, does not support defendant's argument.

2. Pretext

Defendant, for the same reasons as argued above in connection with plaintiff's gender and age claims, contends that plaintiff cannot establish that defendant's proffered reasons for terminating plaintiff's employment are pretextual. But plaintiff's evidence with respect to her ADA claims distinguishes these claims from her gender and age claims. To begin, plaintiff's evidence concerning Mr. Chase's reaction to her most recent accommodation request (*i.e.*, investigating the office for the presence of mold) and the timing of her termination less than one month later certainly lends support to the pretext analysis in the context of her ADA claims. *See Tadlock*, 603 Fed. Appx. at 703. This evidence supports the inference that Mr. Chase, a key decisionmaker with respect to the termination decision, was frustrated with plaintiff's continued complaints about air-quality-related issues in the office and seized upon the case manager situation as a pretext to terminate plaintiff's employment and put an end to the inconveniences caused by plaintiff's asserted disability and her persistent requests for accommodations. *See Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 544 (10th Cir. 2014).

Moreover, additional evidence in the record, viewed in the light most favorable to plaintiff, supports an inference of disability discrimination and retaliation. Specifically, Dr. Helton's written memorandum detailing plaintiff's "history of performance concerns" permits that inference. In that document, Dr. Helton identifies as "concerns" plaintiff's repeated requests for accommodations, including her request for "no smoking outside by back door;" "no one use perfume or sprays;" asking "that burning candles be extinguished but there were none;" plaintiff refusing to go to a client's home because "she was not sure if the home was clean enough for her disorders;" plaintiff's cancelling meetings with clients "because the office was

being sprayed;" plaintiff stating that "keeping doors and windows closed prevents odors;" and plaintiff asking "if new staff [was] instructed about aerosols." Dr. Helton testified that each of the items in the document were performance or disciplinary concerns that he had with respect to plaintiff.

Defendant urges that this document cannot create a triable issue because Dr. Helton was not a decisionmaker and the document was created three months after plaintiff's termination in any event. These arguments are not persuasive. Viewed in the light most favorable to plaintiff, Dr. Helton was a key decisionmaker with respect to the termination decision. Dr. Helton expressly recommended termination to Mr. Chase, who considered that recommendation in making his decision. Dr. Helton signed and delivered the termination letter to plaintiff. And while the document was prepared three months after the termination, Dr. Helton testified that the document provided a summary of emails that he had reviewed and analyzed concerning plaintiff. In such circumstances, the fact that he created the document three months after plaintiff's termination does not undermine the inference created by the document. Defendant also contends that Dr. Helton specifically testified when asked about each individual entry in the document that the items relating to her requests for accommodations were not performance concerns at all. But a jury is required to resolve that issue in light of Dr. Helton's earlier testimony that each item in the document was a concern that he had with respect to plaintiff.

For the foregoing reasons, plaintiff has established a genuine issue of material fact as to whether defendant terminated plaintiff's employment on the basis of her disability and/or in retaliation for plaintiff's accommodation requests. The court, then, denies summary judgment on these claims.

24

B. *Failure to Accommodate Claim*

The ADAAA prohibits an employer from "unlawfully discriminating against an employee by failing to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee." *Dewitt v. Southwestern Bell Tel. Co*., 845 F.3d 1299, 1315 (10th Cir. 2017) (citations and quotations omitted). The statute, then, creates a cause of action for disabled employees whose employers fail to reasonably accommodate them. *Id*. The ADAAA defines "reasonable accommodation" to include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*Id*. (quoting 42 U.S.C. § 12111(9)(A)–(B); accord 29 C.F.R. § 1630.2(o)). "To facilitate a reasonable accommodation, the federal regulations implementing the ADA envision an interactive process that requires participation by both parties. *Id*. An employer's duty to provide reasonable accommodations—or even to participate in the 'interactive process'—is not triggered under the ADA unless and until the employee makes an adequate request, thereby putting the employer on notice.

In this case, plaintiff concedes, as she must, that defendant accommodated plaintiff's disability in several respects. Defendant asked its employees to refrain from using scented

lotions, aerosol sprays and perfumes; rearranged its pest control services around plaintiff's schedule; permitted plaintiff to work out of the conference room whenever necessary; removed the automatic air fresheners from the employee restrooms; and changed certain cleaning products to non-ammonia based products.  Her complaints at this juncture are limited to what she asserts were significant delays in getting the air fresheners removed from the staff restrooms and defendant's failure to remove automatic air fresheners from the lobby and lobby restrooms. Summary judgment is appropriate on these claims.

While an employer's delay in providing reasonable accommodations may violate the ADA in certain circumstances, *see Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249, 1262 (10th Cir. 2001), no reasonable jury could find an ADA violation from the delay asserted here.  Plaintiff contends that the automatic air fresheners were not permanently removed from the staff restrooms until approximately 4 months after her initial request that defendant remove them.  She concedes, however, that she removed them herself during this time period and that they would "intermittently" reappear during that time until they were permanently removed. She identifies no adverse employment action that she suffered during this 4-month period (*e.g.*, that she was refused medical leave) and she does not suggest that the delay precluded her from performing the essential functions of her job.  As a matter of law, the delay is not a violation of the ADA.  *See id.* (alleged delays in implementing modifications did not constitute violation of ADA); *see also Mathews v. Denver Post*, 263 F.3d 1164, 1168-69 (10th Cir. 2001) ("The idea of an accommodation is to enable an employee to perform the essential functions of his job.").

With respect to defendant's failure to remove the automatic air fresheners from the lobby and lobby restrooms, plaintiff similarly identifies no adverse employment action that she

suffered as a result of defendant's failure and she does not suggest that defendant's failure precluded her from performing the essential functions of her job. She concedes that she never utilized the lobby restrooms and that her office was not located near the lobby. While she avers that her "symptoms were triggered by the sprays" and that she had to walk through the lobby on a regular basis, she does not indicate how often her symptoms were triggered and she does not contend that her symptoms interfered with her job in any respect. In these circumstances, no reasonable jury could conclude that defendant violated the ADA by failing to remove the automatic air fresheners from the lobby and lobby restrooms.

In sum, because plaintiff does not contend that any failures on the part of defendant precluded her from performing the essential functions of her job—and, in fact, she admits in the pretrial order that she could perform the essential functions of her job even without these accommodations—her claim necessarily fails. *See Mason v. Avaya Communications, Inc*., 357 F.3d 1114, 1118 (10th Cir. 2004) (district court should reach reasonable accommodation issue if and only if employee is unable to perform the essential functions of the job).

## V.      Retaliatory Discharge Claim

Plaintiff also asserts that defendant terminated her employment in retaliation for her November 18, 2013 email to Dr. Helton in which she questioned the case manager's capacity to treat and work with patients in light of the case manager's self-harming behavior. The Kansas Supreme Court has recognized the tort of retaliatory discharge as a public policy exception to the employment-at-will doctrine. *See Palmer v. Brown*, 242 Kan. 893, 896 (1988). As the Court noted in *Palmer*:

> Public policy requires that citizens in a democracy be protected from reprisals for performing their civil duty of reporting infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare. Thus, we have no hesitation in holding termination of an employee in retaliation for the good faith reporting of a serious infraction of such rules, regulations, or the law by a co-worker or an employer to either company management or law enforcement officials (whistle-blowing) is an actionable tort.

*Id.* at 900. To establish this claim, an employee has the burden of proving by clear and convincing evidence, under the facts of the case, that a reasonably prudent person would have concluded the employee's employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; that the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee; and that the employee was discharged in retaliation for making the report. *Id.* In addition, the "whistle-blowing" must have been done out of a good faith concern over the wrongful activity reported rather than from a corrupt motive such as malice, spite, jealousy or personal gain. *Id.*

Defendant moves for summary judgment on this claim on the grounds that plaintiff's email, as a matter of law, does not constitute a "report" of any violation of rules, regulations, or the law. *See Fowler v. Criticare Home Health Services, Inc.*, 27 Kan. App. 869, 876 (2000) (for retaliatory discharge claim to survive summary judgment, plaintiff must come forward with evidence of a report "of illegal . . . company conduct"). The court agrees. Plaintiff's email to Dr. Helton reads, in full, as follows:

> John,
>
> Late last week Melinda made me aware that [case manager] has been self-mutilating, along with a host of other behaviors. I advised Melinda to contact [case manager's] supervisor ASAP. Since Melinda revealed this to me, I have been concerned about my client's [sic] who are assigned to her, some who may be cutters as well. My concern with protecting the client has been weighing on me

28

and really I do not feel comfortable with my current/future client's [sic] seeing her.  Given that Melinda shared this with me, I decided it would be best to pass along to you in addition to Melinda sharing with Malinda Bailey.

Thanks,

Dawn

Notably absent from this email is any expression of any belief that defendant has engaged in illegal conduct or any reference to any potential violation of any rule, regulation or law.   In her submissions, plaintiff contends that she was challenging the company's decision to permit the case manager to continue to treat patients.  Of course, at the time she sent the email, she had no knowledge as to whether the company had continued to permit the case manager to treat patients (it had not) so her email cannot reasonably be construed as challenging that decision.  Suffice it to say, there is nothing in plaintiff's email to Dr. Helton that any jury could reasonably construe as a report of unlawful conduct.  Summary judgment is granted on this claim.  *See id.* [6]

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. 43) is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated this 27th day of February, 2017, at Kansas City, Kansas.

---

[6] Summary judgment is appropriate for another reason as well.  As explained in connection with plaintiff's gender and age claims, plaintiff cannot establish that defendant's proffered reasons for terminating her employment are pretextual.  *See Hysten v. Burlington Northern Santa Fe Ry. Co.*, 530 F.3d 1260, 1268 (10th Cir. 2008) (Kansas applies *McDonnell Douglas* burden-shifting framework when analyzing whistleblowing claims).

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge